KELSEY C. LINNETT (Cal. Bar No. 274547)
JENNIFER HANE (Cal. Bar No. 275729)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue, Room 10-0101
San Francisco, California 94102-3478
Telephone: (415) 934-5300
kelsey.linnett@usdoj.gov

Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW B. KATAKIS and<br>DONALD M. PARKER,<br><br> Defendants. | Case No. 2:11-CR-511-WBS<br><br>**UNITED STATES' SENTENCING MEMORANDUM FOR DEFENDANT DONALD M. PARKER**<br><br>Judge: Hon. William B. Shubb<br>Date: January 8, 2018<br>Time: 9:00 a.m.<br>Place: Courtroom 5 |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.   PROCEDURAL HISTORY ....................................................................................... 1

III.   SUMMARY OF FACTS .......................................................................................... 2

IV.   SENTENCING GUIDELINES AND RECOMMENDED SENTENCE ............................. 4

   A.   Guidelines Calculations ..................................................................................... 4

      1.   Parker's Guidelines Range is 33 to 41 Months ................................................ 4

      2.   Parker's Volume of Commerce Is Above $1 Million ....................................... 5

      3.   Parker Should Receive a Three-Level Upward Adjustment for His Role as a Manager or Supervisor ........................................................................................................ 6

      4.   Parker Should Receive a Two-Level Upward Adjustment Because of His False Trial Testimony .............................................................................................................. 8

      5.   No Adjustment for Acceptance of Responsibility Applies ............................... 9

      6.   Fine and Restitution ........................................................................................ 10

         a.   Fine ............................................................................................................. 10

         b.   Restitution .................................................................................................. 10

   B.   37 Months Is Reasonable and Appropriate ..................................................... 12

      1.   The Government's Proposed Sentence Reflects The Seriousness Of The Offense, Promotes Respect For The Law, And Provides Just Punishment ............................... 12

      2.   The Proposed Sentence Affords Adequate Deterrence .................................. 13

CONCLUSION............................................................................................................ 14

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*United States v. Bussell*, 504 F.3d 956, 960 (9th Cir. 2007)..........................................10

4

*United States v. Castro-Ponce*, 770 F.3d 819, 822 (9th Cir. 2014) ...............................8

5

*United States v. Helmy*, 951 F.2d 988, 997 (9th Cir. 1992)............................................7

6

*United States v. Koenig*, 952 F.2d 267, 274 (9th Cir. 1991)...........................................7

7

*United States v. Schales*, 546 F.3d 965, 976 (9th Cir. 2008) .........................................9

8

*United States v. Taylor*, 749 F.3d 842, 847 (9th Cir. 2014)............................................9

9

*United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008) ......................................10

10

11

**Statutes**

12

18 U.S.C. § 3553(a) ...............................................................................................12, 13

13

18 U.S.C. § 3583(d) .....................................................................................................10

14

18 U.S.C. § 3663 ..........................................................................................................10

15

16

**United States Sentencing Guidelines**

17

§2R1.1 ..................................................................................................................10, 13

18

§2R1.1(a) ........................................................................................................................4

19

§2R1.1(b)(1) ..............................................................................................................4, 5

20

§2R1.1(b)(2)(A) .........................................................................................................4, 5

21

§2R1.1(c)(1) .................................................................................................................10

22

§3A ..................................................................................................................................4

23

§3B1.1(b) ...............................................................................................................4, 6, 7

24

§3C1.1 ....................................................................................................................4, 5, 8, 9

25

§3E1.1 ...................................................................................................................4, 5, 9

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTRODUCTION

Over seven months in 2009, Donald Parker was an active participant in a widespread conspiracy to rig public foreclosure auctions in San Joaquin County.  Parker attended the auctions every day and quickly inserted himself into the group.  He objected to the method co-conspirator Wiley Chandler used to rig the auctions and instead initiated private, second auctions among the conspirators.  During that time, Parker participated in at least 146 rigged auctions, spending $5.5 million to purchase 52 properties for himself or for companies he represented.  In the round robins for those properties, Parker paid his co-conspirators approximately $600,000 in payoffs.  He received payoffs for participating in another 94 rigged auctions, accepting roughly $325,000 not to bid at the public auctions.

Based on his participation in the conspiracy, the United States respectfully requests that this Court sentence Parker to (1) serve 37 months; (2) serve three years of supervised release; (3) pay a criminal fine of $55,211.77; (4) pay restitution in the amount of $103,150.47; and (5) pay a $100 special assessment.  This within-Guidelines sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing under 18 U.S.C. § 3553(a)(2).  A custodial sentence in this case reflects the seriousness of the crime and is necessary to achieve deterrence.

## II.      PROCEDURAL HISTORY

On March 11, 2014, after twenty-three days of trial, Parker was found guilty of one count of bid rigging.  Docket No. 278.  The jury hung on the second count of mail fraud.  *Id.*  On June 2, 2014, codefendant Andrew Katakis filed his first motion for a new trial, which Parker joined. Docket Nos. 328 and 335.  Katakis and Parker amended their motion three times.  Docket Nos. 373, 380, 445, 446, 611, and 622.  On May 11, 2017, the Court denied the motion with respect to both Katakis and Parker.  Docket No. 637.  On December 14, 2017, Parker filed a further motion for a new trial based on ineffective assistance of counsel and the government opposed the motion.  Docket No. 678 and 684.  The Court is set to hear argument on the motion on January 8, 2018.

//

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

1   On September 12, 2016, the Court sentenced Wiley Chandler, Rick Northcutt, Tony

2   Ghio, Ken Swanger, and six other individuals for their participation in the bid-rigging conspiracy

3   at the San Joaquin County foreclosure auctions. *United States v. Chandler*, 11-CR-511 WBS;

4   *United States v. Northcutt*, 11-CR-038 WBS; *Unites States v. Ghio*, 2:10-CR-144 WBS; *United*

5   *States v. Swanger*, 11-CR-492 WBS; *United States v. Hutz*, 10-CR-238 WBS; *United States v.*

6   *Vanzetti*, 10-CR-239 WBS; *United States v. Jackson*, 11-CR-090 WBS; *United States v.*

7   *Olmstead*, 11-CR-291 WBS; *United States v. Rose*, 11-CR-292 WBS; *United States v. Joachim*,

8   11-CR-511 WBS.  A grand jury returned an indictment against co-conspirator Yama Marifat on

9   October 19, 2017.  *United States v. Marifat*, 17-CR-00189 WBS.  On November 6, 2018, the

10  Court sentenced Parker's co-defendant, Andrew Katakis, who was also convicted of one count of

11  bid rigging.

**III.    SUMMARY OF FACTS**

13      Parker owned two real estate businesses that purchased foreclosed homes through the San

14  Joaquin County bid-rigging conspiracy: West Coast Real Estate and Wild West Holding

15  Company.  He served as CEO of both companies.  Tr. at 2884:14–21.  During the conspiracy,

16  Parker also bought rigged properties on behalf of two other entities: El Dorado Holding

17  Company (El Dorado) and Electronic Mortgage Servicing (EMS).  Parker began working for El

18  Dorado in February 2009 to renovate properties owned by the company.  In April 2009, Parker

19  started attending the foreclosure auctions in San Joaquin County to purchase properties on behalf

20  of the company.  EMS was a limited partnership owned by El Dorado.  Parker served as an

21  authorized representative and agent for both El Dorado and EMS.  Tr. at 2884:9–13.  At the

22  auctions, Parker accepted payments made to him personally and to the various corporate entities

23  that he represented.  Tr. at 2883:17–25.  He also agreed to make payments on behalf of the

24  corporate entities to other bidders at the foreclosure auctions.  Tr. at 2884:1–3.

25      The government concurs with the description of the bid-rigging conspiracy contained in

26  the Presentence Report (PSR) ¶¶ 5–13, 29–31.  In addition, evidence at trial established

27  conclusively that Parker participated in the bid-rigging conspiracy at the San Joaquin foreclosure

28  auctions from April 2009 to October 2009.  For instance, Ghio testified that Parker became part

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

of the regulars after he had shown up at a number of auctions in April 2009, was bidding, and was regarded as a serious buyer.  Tr. at 829:17–830:24; 849:19–850:2.  Parker spurred the group to hold round robins more regularly:

> [F]or a while, Wiley [Chandler] would go around and ask everybody what they're willing to offer for this property, how much are you willing to give the group. And that was fine for a lot of people. Don Parker had a problem with that, he thought that the round-robin was a fairer way to bid. He didn't want to have to tell Wiley what he was willing to pay, he wanted to see what everybody else was willing to pay. And then, if he was willing to stay in a property longer than, say, I was, then he would get a bigger portion of the chop.[1]"  Tr. at 793:16–25.

Parker also objected to Chandler always being the one to purchase properties for the group and at times bid at the public auctions on behalf of the conspirators.  Tr. at 831:17–832:1.  Northcutt testified that Parker called himself the "new sheriff in town," because he wanted to bid at the public auction and to run the round robins.  Tr. at 1078:1– 25.

Parker testified at trial and admitted that he attended round robins with the group.  Tr. at 2823:9–21; 2899:7–8.  He also admitted that he took part in "chopping the pot" – paying other bidders when he won round robins and accepting payments from other bidders when he lost round robins.  Tr. at 2838:14–17; 2914:4–12.  Parker explained that payments from the rounds were split among the losing bidders.  Tr. at 2901:15–2903:15; 2904:3–7.  And he acknowledged that he accepted payments, not for information about the properties, but to lose.  Tr. at 2911:3–21.

Parker himself kept track of the round robins in which he participated and the payoffs he made and received.  Tr. Ex. 4.  His green notebook was admitted into evidence and two examples were highlighted at trial.  *Id.*, Tr. at 2521:7–2522:23.  The notebook contained more than 80 entries.  Tr. at 2523:3–7.  Co-conspirators' records corroborate Parker's entrees.  Ghio's notes show Parker attending over 100 rounds.  Tr. Ex. 1, Tr. at 849:15–18.  Northcutt's notes also show Parker's involvement in round robins.  Tr. Ex 2; Tr. at 1077:4–7; 1079:4–5.

---

[1] The conspirators referred to the payoffs from the round robins as "the chop," which was the difference between the public auction price and the price at the private round robin.  They also referred to "chopping the pot," which was dividing up the payoff among the bidders at the round robin.  Tr. at 779:24–781:10.

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

Torri Yamada testified that Parker tried to bring her into the conspiracy.  She described Parker approaching her during one public auction and offering her money to walk away.  Tr. at 460:1–9.  He threw money down on the cement railing and said, "[T]his is more than you make in a month."  Tr. at 460:17–20.  When Yamada bid against him at the public auctions, Parker would get angry and threaten to bid the price up to make her pay a premium.  Tr. at 461:17–462:12.

## IV. SENTENCING GUIDELINES AND RECOMMENDED SENTENCE

### A. Guidelines Calculations

#### 1. Parker's Guidelines Range is 33 to 41 Months

With one exception, the government concurs with the Guidelines calculation for the Total Offense Level in the PSR.  PSR ¶ 67.  The government differs from the PSR by submitting that a three-level role in the offense adjustment is applicable.  U.S.S.G. §3B1.1(b).  Accordingly, Parker's total offense level should be 20, as calculated below:

| | | | |
|---|---|---|---|
| i. | Base Offense Level (§2R1.1(a)) | 12 |
| ii. | Submission of Noncompetitive Bids  (§2R1.1(b)(1)) | +1 |
| iii. | Volume of Affected Commerce > $1M (§2R1.1(b)(2)(A)) | +2 |
| iv. | Victim–Related Adjustments (§3A) | 0 |
| v. | Role in the Offense Adjustment (§3B1.1(b)) | +3 |
| vi. | Obstruction Related Adjustment (§3C1.1) | +2 |
| vii. | Total Adjusted Offense Level | 20 |
| viii. | Acceptance of Responsibility (§3E1.1) | 0 |
| **Total Offense Level** | | **20** |

The base offense level for a violation of Section 1 of Title 15, United States Code, is 12.  PSR ¶ 58; U.S.S.G. §2R1.1.  The base offense level should be increased one level for the submission of noncompetitive bids (bid rigging).  PSR ¶ 59; U.S.S.G. §2R1.1(b)(1).  A two-level increase is warranted for affected volume of commerce exceeding $1 million.  PSR ¶ 60; U.S.S.G. §2R1.1(b)(2)(A).  A three-level increase applies for Parker's role as a manager and supervisor of the conspiracy.  U.S.S.G. §3B1.1.  A two-level increase for obstruction of justice applies because Parker provided material false information at trial.  PSR ¶¶ 54, 63; U.S.S.G.

§3C1.1 n.4.  The PSR also correctly gives no reduction for acceptance of responsibility.  PSR ¶¶ 55–56, 66; U.S.S.G. §3E1.1.  The calculations above are described further below.

An offense level of 20 results in a Guidelines range of 33 to 41 months for a defendant in Criminal History Category I.

### 2.      Parker's Volume of Commerce Is Above $1 Million

Under the Guidelines, the base offense level is adjusted upward depending on the "volume of commerce attributable to the defendant," which is "the volume of commerce done by him or his principal in goods or services that were affected by the violation."  U.S.S.G. §2R1.1(b)(2).  Parker's volume of commerce is approximately $5.5 million, reflecting the fact that he acquired at least 52 properties through the bid-rigging scheme, paying $4.9 million in non-competitive public-auction purchase prices and an additional $0.6 million in payoffs to co-conspirators.  PSR ¶ 31.  These payoffs represent what Parker was willing to pay on top of the $5.5 million to purchase the rigged properties.  In other words, the public auction price plus the payoff amount indicates the value of the property to Parker.  The government therefore concurs with the Probation Officer's recommendation to apply a two-level enhancement for a volume of commerce of more than $1 million.  PSR ¶ 60; U.S.S.G. §2R1.1(b)(2)(A).

These properties attributed to Parker for the VOC calculation were identified through a detailed review of co-conspirator and trustee documents as well as defendant's own documents collected during the investigation.  As further described in the attached declaration, each property is supported by documentary evidence of the sale price as well as the total amount bid in the round or the negotiated payoff amounts.  The documentary evidence recording the payoff amounts Parker paid to co-conspirators, much of which was admitted at trial, includes:

- Ghio's Spreadsheet (EDRE-AG-002131–EDRE-AG-002165) – inputted daily from notes or bid sheets from the round robins as "a way to track properties, the buyers, how much the overbid was, or the pot was, and then who got how much money."  Tr. at 975:23–976:1.

- Ghio's Bid Sheets (Tr. Ex. 1) – notes Ghio took of the round robins recording the property address, opening bid, round-robin participants, and amounts of each bid.  Tr. at

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

796:12–25.  Ghio recorded the information, "So I could track how much was owed to myself, or how much I owed to somebody else, and then to keep records of what income I had."  Tr. at 797:1–4.  It was important to Ghio to keep accurate records "because we were dealing with money, and everybody likes to make sure they get the right amount of money when they're owed money."  Tr. at 797:14–20.

- Northcutt's Round Notes (Tr. Ex. 2) – notes Northcutt took of the round robins recording the "property address, the participants, and the amount of the bids.  And also calculating what each individual should receive."  Tr. at 1035:14–24.

- Northcutt's Ledger (Tr. Ex. 3) – a "daily log of the records so that we would see exactly what was paid out and what we received back."  Tr. at 1050:25–1051:2.

- Parker's Notebook (Tr. Ex. 4) – Parker kept track of the "chop payments," including the people to whom he owed payoffs, in a green composition notebook.  Tr. at 2906:22–2907:15.

- Payoff Checks (Tr. Ex. Within the range 1800–2354 and others identified by Bates number).

Thus, extensive documentary evidence indicates that Parker purchased at least 52 properties pursuant to a payoff or round during the bid-rigging conspiracies.  *See* Hane Decl. Ex. A (volume of commerce list).  Using the payoff total of $604,566.87, the resulting total volume of commerce (public purchase price plus payoffs amount) is **$5,521,177.09**.  PSR ¶ 60.

### 3.  Parker Should Receive a Three-Level Upward Adjustment for His Role as a Manager or Supervisor

The PSR does not include an adjustment for Parker's role in the offense.  Based on the nature of Parker's participation in the conspiracy, the government's position is that an adjustment for role in the offense of 3 levels under 3B1.1(b) is warranted.  U.S.S.G. Section 3B1.1(b) provides: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels."  To qualify for a three-level upward adjustment under §3B1.1(b), a defendant need only have exercised control over one other participant involved in the commission of the crime.

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

*United States v. Helmy*, 951 F.2d 988, 997 (9th Cir. 1992).  A defendant manages or supervises another if he exercises "some degree of control or organizational authority" over that person. *United States v. Koenig*, 952 F.2d 267, 274 (9th Cir. 1991) (internal quotations and citations omitted).

The bid-rigging conspiracy in San Joaquin County involved at least five participants. Eleven co-conspirators, including Parker's codefendant Andrew Katakis, have already been sentenced.  An additional co-conspirator, Yama Marifat, was recently indicted.  Additionally, Parker exerted organizational authority over another's participation in the illegal conduct. Specifically, Parker brought Chris Barney into the conspiracy, and thereafter managed and supervised Barney's participation in the bid rigging.  Parker trained Barney to purchase properties at the San Joaquin County auctions and to participate in the round robins.  On behalf of Parker, to whom he reported directly, Barney participated in rounds, made payoffs, and received payoffs.  *See* Hane Decl. ¶ 15.

Moreover, an aggravating role enhancement is warranted because Parker also exercised management responsibility over the activities of the criminal conspiracy.  U.S.S.G. §3B1.1, App. Note 2.  When Parker joined the conspiracy, he objected to Wiley Chandler's method of determining the payoffs for rigged properties.  Instead of conspirators telling Chandler how much they were willing to pay for a rigged property, Parker instead organized the rounds robins, or second auctions where conspirators bid against each other.  Parker also objected to Chandler always being the designated bidder at the public auction and at times bid for the group.  Parker referred to himself as "the new sheriff in town," which conspirators took to mean that Parker wanted to exert control over the bids at the public auction and at the round robins.

Parker also enforced the conspiracy, by attempting to keep new participants at the public auctions from bidding on properties.  For instance, he offered one newcomer (Torri Yamada) cash to not bid against him on a property.  Parker also threatened to bid against Yamada in order to make her pay a premium price, if she continued to try to purchase properties at the public auction.  Altogether, these considerations weigh in favor of applying a three-level adjustment for Parker's role as a manager and supervisor of the conspiracy.

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

1
2

### 4.      Parker Should Receive a Two-Level Upward Adjustment Because of His False Trial Testimony

3      A two-level increase is warranted for obstruction because Parker provided material false

4   information at trial.  U.S.S.G  §3C1.1.  A court applying the obstruction enhancement based on

5   perjury must expressly find that "(1) the defendant gave false testimony, (2) on a material matter,

6   (3) with willful intent."  *United States v. Castro-Ponce*, 770 F.3d 819, 822 (9th Cir. 2014).  Each

7   of the elements is satisfied here.

8      At trial, Parker tried to have it both ways, admitting some facts while denying others.

9   Specifically, Parker testified falsely that he did not enter into an agreement not to bid at the

10   public auction.  Tr. at 2879:18 –20, 2868:17–19.  Parker also denied receiving any payments as

11   the result of agreements not to bid among other bidders, further testifying that three checks he

12   received from co-conspirators were "absolutely not" payments for an agreement not to bid at the

13   public auction.  Tr. at 2928:3–9.

14      Considerable evidence at trial demonstrated that Parker did, in fact, participate in

15   agreements to stop bidding.  Co-conspirators testified that payments were integral to the bid-

16   rigging conspiracy; they were made in exchange for not bidding against each other at the public

17   auction.  Tr. at 631:17–636:1; 645:4–20; 654:22–655:21; 761:2–10; 809:20–810:8; 830:25–

18   831:16; 832:14–19; 836:18–23; 842:13–18; 1018:3–1019:6; 1040:22–1041:4; 1064:3–12;

19   1076:7–16; 1080:10–1081:6; 1083:5–11; 1295:5–13; 1311:16–1312:7; 1326:3–7; 1540:10–

20   1541:18.  To be part of the round robins, members of the conspiracy had to be part of that

21   agreement.

22      Parker, however, provided false and logically inconsistent narratives to explain his

23   participation in the round robins.  First, he repeatedly insisted that he merely participated in the

24   round robins in order to get "information," denying that he exchanged payments with co-

25   conspirators for any other purpose.  He claimed that he paid the other bidders to gain information

26   about properties despite admitting he had the ability to get his own information on the properties,

27   at a substantially cheaper cost.  Trial Tr. at 2888:21–2890:21.  Further contradicting his own

28   narrative, Parker admitted that the payments were proportional to the bids made at the round

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

robins and split among the other bidders.  Trial Tr. at 2901:15–2903:15; 2904:3–7; 2906:22–2908:17.  In other words, the more a co-conspirator bid at the round robin, the greater share of the chop he received.

Additionally, Parker argued that while he was making payments to co-conspirators for information at the round robins, he was receiving similar payments from the other bidders for a completely different reason.  He testified that he received payments at these same round robins not for information, but for "flipping" houses he had already won at the public auction.  Tr. at 2896:7–2897:12; 2911:3–21.  Parker recorded these payments in the same notebook as the "information" payments.  Tr. at 2906:22–2908:17.  Parker made all of these claims despite evidence at trial that he received payments at round robins for being the losing bidder, not for "flipping" properties.  Trial Tr. at 2910:11–23.

Moreover, Parker's statements at trial were material because the jury had to find that he knowingly joined the conspiracy to find him guilty of bid rigging.  "Testimony is material if it is information that, if believed, would tend to influence or affect the issue under determination." *United States v. Taylor*, 749 F.3d 842, 847 (9th Cir. 2014); U.S.S.G. §3C1.1 cmt. n. 6.  And finally, Parker's false testimony was willful.  There are no indications that Parker was mistaken or confused, nor has he ever sought to revise his position even after being confronted with the evidence.  His denials of his bid rigging were repeated and clear, and have continued to this day.  Accordingly, Parker should receive a two-level upward based on his material false testimony.

### 5.   No Adjustment for Acceptance of Responsibility Applies

The government agrees with the PSR that Parker is not entitled to any reduction for acceptance of responsibility under U.S.S.G. §3E1.1(a).  A defendant may receive a two-level reduction if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. §3E1.1(a); *United States v. Schales*, 546 F.3d 965, 976 (9th Cir. 2008) (defendant must admit all of his guilt, cooperation notwithstanding, before receiving downward adjustment).  In general, acceptance of responsibility credit is not available to a defendant who "puts the government to its burden of proof at trial." U.S.S.G. §3E1.1 comment n. 2.

//

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

1       In this case, Parker contested factual guilt at trial.  As discussed above, he willfully

2   offered false testimony, claiming that he did not agree to rig bids or to accept payments not to

3   bid.  As demonstrated by his objections to the PSR, Parker still does not accept that his conduct

4   was illegal.  Accordingly, a downward adjustment for acceptance of responsibility does not

5   apply.

6         **6.      Fine and Restitution**

7       The Court should also order Parker to pay a fine and restitution based on rigged

8   properties he bought and the payoffs he received.

9         **a.      Fine**

10      Under Section 2R1.1(c)(1), the fine for an individual convicted of an antitrust offense is

11  one to five percent of the volume of commerce.  Here, Parker's fine range is **55,211.77 to**

12  **276,058.85**, as calculated in the PSR.  According to the Guidelines background, "The

13  Commission believes that most antitrust defendants have the resources and earning capacity to

14  pay the fines called for by this guideline, at least over time on an installment basis."  U.S.S.G.

15  §2R1.1, comment. (backg'd).  The Guidelines further state, "Substantial fines are an essential

16  part of the sentence."  *Id.*  In accord with the PSR, the government recommends a fine at the low

17  end of the range.

18        **b.      Restitution**

19      Although the Mandatory Victim Restitution Act, 18 U.S.C. § 3663, does not apply to this

20  case, discretionary restitution may be imposed as a condition of supervised release under 18

21  U.S.C. § 3583(d).  For the Court to order restitution, the government must establish by a

22  preponderance of the evidence the identity and the amount of restitution owed to each victim.

23  *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).  To determine the proper amount of

24  restitution, courts may rely only on evidence that possesses "sufficient indicia of reliability to

25  support its probable accuracy."  *Id.* at 557.  Further, restitution "need not be determined with

26  precision.  The court need only make a reasonable estimate of the loss, given the available

27  information."  *United States v. Bussell*, 504 F.3d 956, 960 (9th Cir. 2007).

28

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

1    Parker received payoffs on at least 94 properties during the bid-rigging conspiracies.  *See*

2    Hane Decl. Ex. B (restitution list).  The government has identified 21 victim-banks who received

3    artificially low prices at the rigged public auctions due to Parker's conduct.  As with the volume

4    of commerce calculation, these properties and payoff amounts were identified through a detailed

5    review of co-conspirator and trustee documents as well as defendant's own documents collected

6    during the investigation.  As further described in the attached declaration, each property is

7    supported by documentary evidence of the payoff amounts owed to Parker from a round or

8    negotiated payoff.  Similar to the volume of commerce analysis, the documentary evidence

9    recording the payoffs Parker received from co-conspirators includes Ghio's spreadsheet, Ghio's

10    bid sheets, Northcutt's notes, Northcutt's ledger, and Parker's notebook, as well as payoff

11    checks.

12    The restitution amounts here are the payoffs that co-conspirators made to Parker or to

13    companies Parker represented to acquire the rigged properties.  Payoffs are the best measure of

14    the amount that co-conspirators would have bid at a competitive public auction but did not due to

15    the bid-rigging conspiracy.  Parker and co-conspirators agreed not to compete for properties at

16    the public auctions, causing the foreclosed properties to sell at artificially low prices.  The co-

17    conspirators would then have a second, private "round robin" auction, where they would bid

18    competitively on the property.  At these round-robin auctions, the losing bidders would receive

19    payoffs equal to the difference between the round-robin price and the public auction price for the

20    properties.

21    The best approximation of the amount that these conspirators diverted from the public

22    auctions is the amount that they were willing to pay at the round-robin auctions.  In every case,

23    the final bid in the round robin represents the additional funds that a conspirator was willing to

24    pay to acquire a property.  But that money of course did not go to the trustee, it went to the co-

25    conspirators.  Restitution in this cases thus returns the money to the rightful beneficiaries and

26    prevents Parker from obtaining a windfall from his illegal conduct.

27    Of the 94 properties that the government identified, Parker acknowledges that he directly

28    received and benefited from payments on 16 properties.  He apparently agrees that the Court

11

should impose restitution in the amount of the payments on those 16 properties.  For the remaining properties, Parker contends that the payoffs went to his employer El Dorado.  The government does not object to limiting restitution to the amount that Parker personally pocketed, rather than the amount received and retained by El Dorado.  In addition to the 16 properties agreed to Parker, the government also identified checks to Parker or Parker's company for four other properties.  Moreover, in the letter submitted by Parker from El Dorado's owner, Tom Yarak, Yarak states that Parker received 10 percent of profits from the round robins.  Docket No. 686, Exh. 1.  As identified in Exhibits B and C, Parker owes restitution for the payoffs he personally received on 20 properties, $78,517.00, as well as the 10 percent cut that Parker received from payoffs to El Dorado or EMS, which amounts to $24,633.47.  Accordingly, the court should order restitution in the amount of $78,517.00 plus $24,633.47, for a total of $103,150.47.

### B.      37 Months Is Reasonable and Appropriate

Based on Parker's role as a manager and supervisor of the conspiracy, his refusal to accept responsibility, and the significant volume of commerce affected by this conspiracy, the Guidelines suggest a custodial sentence of 33 to 41 months.  The factors under 18 U.S.C. § 3553(a) do not support any departure or variance below the Guidelines sentence.  Instead, a 37-month sentence, at the middle of the Guidelines range, reflects the seriousness of the offense and affords adequate deterrence.  *See* 18 U.S.C. § 3553(a)(2).

### 1.      The Government's Proposed Sentence Reflects The Seriousness Of The Offense, Promotes Respect For The Law, And Provides Just Punishment

The government recommends a sentence at the middle of the sentencing guidelines, reflecting Parker's active role in the conspiracy during the seven-months between April and October of 2009.  In that period, Parker attended the foreclosure auctions every day and participated in rigging at least 146 properties.  When Parker joined the conspiracy, he objected to co-conspirator Chandler's method of determining the payoffs for rigged properties.  He sought to regularize the process, making it more transparent for members of the conspiracy.  Instead of conspirators telling one person, Chandler, how much they were willing to pay for a rigged

12

property, Parker instead organized the round robins, or second auctions where conspirators bid against each other.  Parker also objected to Chandler always being the designated bidder at the public auction and at times bid for the group.  Parker brought another participant, Chris Barney, into the conspiracy, and thereafter managed and supervised Barney's participation in the bid rigging.  Parker also enforced the conspiracy, by attempting to keep new participants at the public auctions from bidding on properties.  For one newcomer, Torri Yamada, Parker offered cash to not bid on a property or else Parker would bid the price up to make her pay a premium.

A 37-month sentence properly reflects the seriousness of the offense.  Parker's volume of commerce calculation counts only the rigged properties that he purchased; it does not include the properties where he received a payoff as part of the conspiracy.  As the Guidelines commentary explains, under these circumstances, use of volume of commerce to calculate sentences for bid rigging results in an "understatement of seriousness."  U.S.S.G. §2R1.1 comment. (n.6), comment. (backg'd.) ("The Commission believes that the volume of commerce is liable to be an understated measure of seriousness in some bid-rigging cases.").  To reflect the substantial harm inflicted by the conspiracy, the Court should impose a sentence at the middle of the range.

### 2.    The Proposed Sentence Affords Adequate Deterrence

Moreover, an important consideration for the Court is whether the punishment will adequately deter future violations of the antitrust laws and white collar crime generally.  *See* 18 U.S.C. § 3553(a)(2)(B) (courts should consider "adequate deterrence to criminal conduct" in selecting a sentence).  The background to the applicable Guidelines explains the Commission's intent that individuals who rig auctions should ordinarily go to prison:

> [P]rison terms for these offenders should be much more common, and usually somewhat longer, than typical under pre-guidelines practice. Absent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases . . . in very few cases will the guidelines not require that some confinement be imposed.

*Id.* U.S.S.G. §2R1.1 cmt. background.

In this case, Parker played a significant role in the conspiracy by managing and supervising both Barney's participation as well as the operation of the conspiracy.  A fine and

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS

restitution would neither reflect the seriousness of the offense nor serve as an adequate deterrent to others who may be tempted to profit by corrupting the integrity of public auction processes. Hence, imposition of a Guidelines sentence is warranted.

<b>CONCLUSION</b>

For the foregoing reasons, the United States respectfully requests that this Court sentence Donald Parker to 37 months in prison, three years of supervised release, a criminal fine in the amount of $55,211.77, restitution in the amount of $103,150.47 and a $100 special assessment.


Dated: December 29, 2017.                    Respectfully submitted,


                                              /s/ Jennifer Hane
                                             Jennifer Hane
                                             Kelsey C. Linnett
                                             Trial Attorneys
                                             U.S. Department of Justice
                                             Antitrust Division

UNITED STATES' SENTENCING MEMORANDUM
11-CR-511-WBS